Next case is William Young v. Lumenis, Inc., 06-1455. As soon as counsel for appellee can sort out its equipment there. This is a case about declawing cats, so let's cut right to the issues. We do ask the court to overturn two decisions in the district court, one related to the claim construction of the patent in suit that found that the claim was indefinite because the term near, as defined by the district court, was indefinite. We also ask that the court overturn the finding of inequitable conduct and remand for further issues. It was a summary judgment of inequitable conduct. I'd like to start with the issue of definiteness. In this particular case, the district court here, because it never considered the intrinsic evidence, the language of the patent itself. Before you get, why don't you start off in your discussion of indefiniteness by telling us how you would construe the claim language. We believe that near means at or close to the edge of the umbilical crest, such that enough tissue is retained to cover the PCC after the conclusion of the surgical procedure. Now, the references to those in the specification we pointed out, where the first incision is made is set forth in 8-87, column 1, lines 65-67. For example, column 4, lines 36-41 on 8-88. The reference is to the preservation of the tissue, which is, in essence, what this invention was about. It was the preservation of the tissue so that the surgical site can be covered with the remaining epidermis or the skin. The references in the specification we point to are in 8-87, column 1, lines 58-60, 8-87, column 2, lines 42-44, and 8-88, columns 4, lines 51-54. How do we know how close near is, and how do we tell whether what you're claiming, near, is in the prior art? Isn't that part of indefiniteness, to be able to distinguish the claim from what's old, see if it's valid or not? I have two answers to that. One is specific to the facts, and one is generally to the law. I'll start with the facts. How do we know what's near enough? Dr. Young testified repeatedly that you know where the edge of the angle crest is. The district court found that in his decision. You know where it is pre-surgery. Because of the varying sizes of the patients or the cats involved, you can't say at a specific anatomical location because that might be unduly limited. Near means when you're done, the surgeon makes an evaluation pre-surgery to say, okay, I need to preserve this much skin to cover the onychectomy site, to cover the P2 joint after the surgery. So from a factual standpoint, that's all evaluated prior in time to the surgery. Now, from a legal standpoint, I'm not sure the law says that. Counsel, can I ask one more question on a factual one? Yes. So what you're kind of saying is sort of like, look, we can't define this in terms of millimeters. Sort of like if you take a woman who's 4'10", how far is her liver from her stomach versus if you take a man who's 6'5", you can't necessarily say the liver is always 5 millimeters from the stomach or something along those lines. And the same is true with regard to the cat and where near the distal edge might be. Is that kind of what you're saying factually? Am I getting it right? You are. The size of the patient differs. This doesn't just apply to house cats. I mean, it can apply to a tiger or other felines that are noticeably larger. Okay. The reason I don't understand your answer to that, so maybe you can enlighten me, is that in Claim 6, you do, the limitation in Claim 6 is at the edge, which suggested to me that you can be specific, that it's not that what's going on here precludes you from being specific because of the different sizes of the patient. I believe that the at limitation in Claim 6 is one specific way that we can claim this in a very, very narrow sense. But claims, we're allowed to claim as broadly as the prior art allows. Now, we know the prior art, well, we haven't done a 103 analysis or a 102 analysis, but the fact of the matter is here, if we limit ourselves to at the edge of the anvil crest, the anvil crest can, the outline is known. You can't see it directly before the surgery. So the claim to at, assuming that a surgeon is off by the distance of one scalpel blade, one millimeter, that claim's not infringed. So the broader claim that was sought is Claim 1. That puts it in relative terms. The relative term is near, and near is defined so that we accomplish the result desired in the specification to preserve enough tissue. Now, that's as broadly as the subject matter allows in this case, which is commensurate with what this court has said we're allowed to do. The other side's response, one of their responses, as I understood it, to that construction, is if you're saying it's the sufficient tissue to preserve to cover the surgical site, is that that's a problem because then the alleged infringer wouldn't know whether he or she is infringing until the end of the day. There's no way to predict that up front. So what's your answer to that? My answer is I think that's factually incorrect. Dr. Young has testified, and I can point you to the myriad of references that Dr. Young has testified in. If you'd like, I'll give you a whole list. I think particularly 1589, he says it can all be evaluated pre-surgery. You can look at the cat. You can determine how much skin is required to preserve it so you know how much will be near. Now, is it possible that you can botch the surgery and wind up not infringing? It is. But in the end of the day, infringement isn't determined until after making a widget. Infringement isn't determined until you have the widget and you can evaluate it. But beforehand, you know how to avoid it. For example, it's really easy. If you want to avoid Dr. Young's claim, make the incision just like the priority, the P2-P3 joint. Just make it right there. You avoid infringement. Everybody knows that. The question is, I think it's clear that it can be determined. I think I'm going to – I believe A1589. I just want to take a quick look. I believe that's one reference where it's relatively clear. Okay, in A1588 to 89, there's a reference that says, really, tell me when you start. I'm reading from the page of 295 at line 21. Tell me when you start. When you start your procedure, when a person of ordinary skill in the arts starts their procedure, where do they put the incision such that it is near the edge of the umbilical crest? And the answer is you locate the umbilical crest, which most people can do. They know where it is. They look at the size of the cap. They determine the amount of skin that needs to be preserved, and they make the incision. So, factually, that's been – it's testified to, and it's the only testimony in the record that people skilled in the arts know how to do this. Can I move you on to inequitable conduct just before you run out of time? Yes. And let me ask you, you make a number of arguments as to why the inequitable conduct finding here should be reversed. And as I understand, so correct me if I'm wrong, one of them is the first line of defense is that this alleged infraction was cured while the reissue procedure process was still open. Yes. You probably regard that as the unkindest cut of all. This is true. Actually, I think my colleague found it as the unkindest cut. Is there any – has our court ever spoken to that issue? No. No. The closest case is Roman Haas. And Roman Haas specifically says, we're not dealing with an issue where the case in the prosecution is still open. I've been unable to locate any case that specifically addresses the point that where the prosecution is still open, a district court finding a claim, I don't know which claim in this particular case, but to be – have been acquired by inequitable conduct. Because here, no claim at that time had been acquired. Now, I think the Roman Haas case – And why wasn't it reasonable for the district court to have found inequitable conduct because you should have made that presentation earlier and you didn't? In the first instance, the actual submission. I think all the evidence is that there was a decision that was made that it couldn't be submitted. So in the first instance, there was one time after that where the testimony was submitted. Now, I will grant it's not submitted in total accordance with the guidelines of Roman Haas. But when it was determined that all this had to be submitted, it was, including the decision of the district court. And it was all done prior in time to the time the examiner ever even considered the initial response. So at the time that the examiner picked up the response, she had the totality of the evidence at her disposal. But there was a response to the first PTO office action that didn't include the Hedlund testimony. Absolutely. That's what I said. There was a decision that didn't include it. And then Mr. Foster submitted an affidavit on why it was not included. He made an evaluation. He read the text in Chisholm. He read the rule. Now, albeit he may have made a mistake. We grant that there may have been a mistake here. But he did an honest evaluation of the rule and determined that he couldn't submit it. But the mistake you're talking about is whether the testimony is submittable in a re-exam because usually it's only patents and print publications. You're not saying the mistake is that he realized he should have submitted it because it's material and it directly contradicts. That's not a mistake. You're not admitting that. No, that is absolutely correct. But it's quite clear that it's not just limited. The requirement by the PTO is not limited to publications, correct? The rule as an issue says that it should have probably been submitted. Yes, we concede that. Are you saying that there are fact questions and that this shouldn't have been decided on summary judgment? I honestly believe that there is a serious question of material fact as to the state of mind. Here the district court never considered the affidavit or maybe considered them, never commented on them in the decision about how the exculpatory evidence explaining why that was not submitted. The district court never opined or gave any indication that it was even considered. Rather, the district court simply inferred intent based on the high level of materiality that it found. Ian? I don't want to cut you off. You can use your time or not. You're into what you wanted to say as a rebuttal. I will at this time answer any questions that you might have in the meantime. Mr. Lowenstein. Thank you. May it please the court, I'm David Lowenstein. I represent luminous in this matter. Just to put this into perspective, I brought a declawed cat claw with me. It's similar to the one that we showed to the district court. It's not identical. Cleaned up a bit. It's been cleaned up. The reality of this here is this part here is the claw, which is not at issue. The part that we're talking about is this tiny part here. That's what Young at one point said was the umbilical crest. The reason all this matters is that he's saying that the prior art incision is right here where the joint is. And we've explained that Professor Hedlund's circumferential incision is over here where the cuticle-like skin is where the claw attaches to the rest of the bone. So we're talking about, at best, the area that's on the order according to the testimony that was given in the Markman hearing, 3 to 5 millimeters. So the prior art is on one side of the joint, and it's on the other side of the cuticle-like skin. And in that context, the word near the edge has no meaning. And we've explained that in our papers. And the only innovation that Young claims to have made here is that he's moved this first incision from where he says it had been at the joint over just a couple of millimeters over to the right-hand side or your left-hand side, I suppose. And the testimony that we have submitted, for example, Dr. Arzen says it's all near the edge anyways. There's not that much of a space. That's at A1743. He's also testified that when he made his incision, it was all the way from the joint all the way up to the claw. That's also in that same page range, A1743 to 74. And that he made his incisions everywhere from the joint to the nail and everywhere in between. And Young relies on that testimony to say that this near-the-edge limitation is clear. It's obviously not. Counsel, if the claim language had said, as the other side had asked, that the claim construction of near the edge of the ungular crust of the claw should be near the most distal edge of the epidermis so that you leave enough tissue to still cover, would that have been definite? If that had been the terms that were actually in the claim rather than just the way we're going to construe the claim, would that have been sufficiently definite? Your Honor, let me answer your question. The conclusion of the opening brief sets forth yet a new definition. The definition that they've offered now is at or close to the distal edge of the ungular crust such that sufficient tissue is retained to cover the exposed tip of the second phalanx. That's in their brief, pages 42 and 50. We don't know what close to is. Again, we're talking about an area that's three to five millimeters in size. And we don't know what sufficient tissue is. There's nothing in the patent that tells you what sufficient tissue is. In fact, sufficient isn't even used in the patent. Moreover— Well, sufficient enough tissue to form a covering for the opening, right? It may be. It may be. But the prior art, Professor Heflin's textbook at A866, says the skin may be left open. Sutures or tissue adhesive are optional. So she plainly had sufficient tissue to cover the opening. There's nothing new here. There's no— Well, that's an obviousness or an anticipation argument. I mean, that's one of the questions— I mean, it seems even the district court's analysis here talks about a surgeon being unable to avoid infringement, failing to distinguish it from the prior art. It seemed—sounded to me more like an obviousness issue than an indefiniteness one. It's both, Your Honor. The reason they're so close is because there's nothing new here. The only—the point of novelty, the point of alleged novelty here is this location of the first incision. So everything else in these claims, cutting the tendons, the ligaments, and so forth, the synovium, which is a fluid sac between the joints, making all these other incisions, were all in the prior art. You couldn't do a cat declaw without cutting everything. Was there an obviousness defense raised? We hadn't got that far, Your Honor. We had just gotten up to the Markman hearing. There was certainly going to be an obviousness defense raised. Is the distinction between, on the one hand, we don't have before us whether it would have been obvious and hence untouchable, but we do have before us whether it is sufficiently clear and definite so that one could tell whether it's obvious or not? It's the second part of your question, is you can't really tell where this claim starts and stops, and that's the fundamental problem. As I've said, the prior art, it bounds both sides of this umbilical crest. And if you can't determine where the claim starts and stops, you don't give the public notice of what it is that constitutes infringement. In fact, in the brief that they submitted, contrary to the testimony you just read at page 40, he says, Dr. Young makes it clear that intent is not controlling and determining how much tissue is sufficient. And there's a quote. It says, I think you can look at the procedure post-surgery. That's his highlight in the brief to determine that. I think it's pretty evident. Dr. Young, it carries on, concluded that you can look at the actual completed procedure to determine whether or not there's sufficient tissue. There's no notice. There's thousands of vets across the country that are at risk of infringing this patent, and they don't know until it's too late. What about inequitable conduct? Shouldn't that go back because it shouldn't have been a summary judgment? No, Your Honor, because summary judgment of intent, as the court held in the Farring case at 1192, is proper if there are three factors. One is that the person knew about the information. There's no doubt that Young knew about Professor Hedlund's testimony. There's no doubt at all about that. The second is that they knew or should have known about the materiality of the reference. And there can't really be any doubt about that, too. That's in section 1.555. That is not really ever cited in the papers except in passing in the reply when they commented on our brief. He's never taken head-on why it is Professor Hedlund's testimony isn't inconsistent and doesn't refute the statements that he made to the patent office. Wait a minute. I certainly interpreted his brief as taking that head-on. In fact, it caused me to sit here and go back and forth between her testimony and the actual disclosure in the Fossum reference, which seemed to me to be radically different from each other. Counsel, I mean, the Fossum reference shows only one cut. It's between P2 and P3. There is nothing at all I can see about a first incision, second incision revealed anywhere in the Fossum reference. Do you agree with that? No, I don't, Your Honor. She seemed to agree with that in her testimony. No, that's not true. With all due respect. And show me in her testimony where she actually talked about the first incision and how it's disclosed in the Fossum reference. She says that the picture, 1337, was accurate. Show me her testimony, Counsel, not your synopsis of it because I don't see it. She says that, first of all, the text of the reference is circumferentially incised. It's cuticle-like skin. That's the point that we have to begin us. Circumferentially incised, the cuticle-like skin. Her reference is at A865. If you look at the text in the right-hand column in the middle of A865, it says, I'm not sure if you're with me or not, but circumferentially incised, the hairless, cuticle-like skin away from the claw, okay, near the articulation between the second and third phalanx. The cuticle-like skin is only in one place, and that's right here at the junction of the skin and the claw. It's not at the joint. She explained in her testimony, and I'll try to find it here on the fly, that, and I think we quoted in our brief, actually, that that picture showed the incision after the skin had been retracted. Maybe your assistant can help you. My assistant, all right. It's in our brief where she said, the quote was that that picture is after the skin had been retracted. In fact, that's what the examiner found in the reexamination. If you look at the reexamination papers, the examiner's first conclusion was that 13th, I'm reading at A2311, she says, moreover, figure 1337B illustrates the epidermis in a retracted position above the dotted line. And that's the same thing that Professor Hedlund said, and I'm looking for the testimony here. It's in our paper, but I'll cite it back to you. Because the question and answer from her testimony that I see is questions. And if we look at 1337B that's referred to in that sentence, that's Hedlund Exhibit 2, does that illustration show that circumferential cuticle incision you just described? And her answer, no. It's not really showing the cuticle incision. It's showing, it's referring to the anatomy there, and the dotted line is showing you where to go through the joint space after you've made your cuticle-like incision. But there doesn't seem to be anything in this reference to suggest there needs to be a first incision and a second incision. I only read it as one incision, and it's between P2 and P3. With all due respect, again, you have to go back to the text. The text says, circumferentially incise the cuticle-like skin. There is no cuticle-like skin over the joint. But that same sentence then says, do it between the second and third phalanx. It says near the articulation. Between the second and third phalanx. I'm sorry, are you at 8? I'm the part you read to me just a second ago, 865. It says, circumferentially incise the hairless cuticle-like skin away from the claw. Okay, the claw is at the very end here. Near the articulation between the second and third phalanx. It doesn't say cut through the joint. She's using the word near in that context to be between the joint and the cuticle-like skin. And then when you even look at the figures that this is referring to, it says figure 1337B. Look at 1337B. It shows a scalpel very clearly placed between the second and third phalanx. I found the testimony in my outline here, and I'll read you from my notes here. It says, the question was, okay, can you look at the figure on page 147, which we have here, 1337B. Yes, can you explain why the scalpel is shown at the joint in the figure? Because it's demonstrating as you begin to cut through the tendons that attach to P3. So this figure is after the first circumferential incision has already been made. Answer, yes, it is. And has that skin already been pulled back at that point? Correct, and that's at A1491. The transcript page is 21. So whether or not, you know, we can debate whether or not she says what she said, and she, in my mind, says circumferentially incise the cuticle-like skin. But whether or not we can debate whether or not the scalpel is at the joint and not in the picture, it refutes what it is he told us happened. But that's just it. Wait a minute. Isn't that just it, though? It's a question of fact. Since we can debate it, and you and I clearly disagree on what this thing says, so then doesn't that make it a question of fact whether this is a material thing that should have been disclosed? No, it's not, Your Honor, because 155 says if it refutes or is inconsistent with the position the applicant takes, it's not an anticipation or an obvious disclaimer. But see, I don't think it is, and you do. So that's a fact. Well, Your Honor, we have considerable testimony from a number of people that said Hedlund's reference says just what it is I read, in plain old words, circumferentially incised the cuticle-like skin. It's nowhere else on the first page. Okay, so let's accept the materiality. Is there any case which this Court has ever opined that there's an inequitable conduct finding where the reference at issue is submitted before the case is closed? Well, I have to agree with Mr. Hoffman on that. There is no case that addresses the specific facts. The closest is the Rome-Haas case. But doesn't that seem like an extension of where the law and inequitable, a serious extension of where the law of inequitable conduct. For instance, hypothetically, if you don't submit a reference for whatever reason, and then you hear a rumor that there's some other party out there, a competitor, and they're going to come in with an inequitable conduct thing after the reissue issues because they're going to go after this. So you turn around three weeks later, and to just cover yourself, you give it to the Patent Office. Are you saying that that would have been a violation, that there's a violation of inequitable conduct between the time you don't submit it and the time you do, even though the reissue is still open? I'm not sure I follow the question, but can I focus on the situation here? We have a reexamination that's parallel in time to the renegotiation. There would have been no other time for us to raise this. If we had waited, I think, which is what Jung's argument is, until the reexamination was complete, the case could have been over. But why does that drive us, whether or not you could have had a chance to find, to allege inequitable conduct? The question I'm asking is whether or not it is. They submitted the reference. The reissue is still open. We're talking about the reexam? Reexam, I'm sorry. I believe it's complete at this point, but I'm not sure. Why doesn't their submission cure it? Now, you may have jumped the gun. Maybe if your interest was in charging them with inequitable conduct, you might have had to wait. Well, let me answer the question. The Rome Haas case sets out really four factors in order for you to cure. I'm not saying you can't cure, but I'm saying, in this case, they didn't cure. The first is it has to be done on somebody's own volition. It has to be done voluntarily. That was not done here. It wasn't done until after we filed our papers. The second is you have to evade. That doesn't mean they didn't do it voluntarily with the PTO. You filed papers in the district court litigation. The judge didn't order them, did they, to file these and disclose this to the PTO? There was no order requiring them to do it? That's true. However, in the semiconductor energy case that we've cited, it says that some sort of grudging or compelled disclosure long after the fact, and that case was compelled by licensee, is not evidence of good faith. But this is long after the fact. They did it before they even had a second office action. Your Honor, he said he wouldn't have done it, period, if we hadn't filed a motion. He said he didn't think, based on his research of Chisholm, that he had to submit this at all. So it would have never been submitted had we not filed our papers. So that's factor number one in Rome Haas. He would have never submitted it. But that's a catch-22 factor. If he submits it and tries to cure it just in case, then you use it against him because you claim that's an admission of materiality. I mean, it seems to me that even as a policy matter, and we clearly don't do policy here, we do law, but it seems to me that this doesn't promote the interests of the inequitable conduct offense because it says to somebody, don't submit it. You're almost prejudiced. You sort of lose your chance. I see I'm out of time, but can I just briefly address the three other Rome Haas factors because I agree this is an important issue. Quite frankly. The second factor is you have to admit your error, and the third is you have to point to the examiner where that error is. And he hasn't to this day admitted that he's done anything wrong. So even assuming it was done on his own volition, he still hasn't said I did something wrong. But he submitted your papers. He submitted all the district court's findings in this case that would bring the examiner to exactly what the concern was with regard to this testimony. Your Honor, it was done long after the conduct at issue happened. Long after? Yes. It was before the next office action even. I don't believe so. 90 days, right? And the examiner considered it by even checking it off. As I understand what happened was there was another office action. The district court then issued its opinion, and then after that there was finally a footnote in one of the papers that says, oh, by the way, look at the transcript. We dumped 150 pages of transcript, half of which is completely irrelevant. We gave that to you. We didn't tell you where to look in there. But they gave him the opinion. Pardon? They gave him the district court opinion right after it issued. Your Honor, it seems to me that it's inconsistent with Rome-Haas. There has to be some action by the patentee acknowledging that a mistake was made, pointing the examiner where the mistake is, where the facts are, where the truth lies, and none of that's really happened. It's sort of backing into it saying, well, here's 150 pages of transcript. You can figure it out. And, oh, yeah, the district court issued this opinion. But they've never said we made a mistake. To this day they said it's not material. We didn't make a mistake. And you can't say we didn't make a mistake and also try to cure under the Rome-Haas case. Thank you, Mr. Lowenstein. Thank you. And how much time does Mr. Hoffman have left? Just under three? Under four. Under four. We'll give you five minutes. Okay. Thank you, Your Honor. I'd like to start off addressing the last issue that was raised. I don't think anything could be more clear than giving the district court's opinion that says chapter and verse where the alleged misconduct occurred. In giving it all to the patentee, the fourth second office action was issued. I believe that. And you also turned over the deposition testimony that Judge Moore was discussing before the district court issued it. Earlier we turned over the deposition testimony, but I will concede that at that time we didn't say you have to look at these pages and these line numbers. That was done when the opinion was given. So the examiner was honorable with all of the information prior to issuance of the second office action. So I don't think anything could be more clear than all of the elements of Rome-Haas were met. Counsel, this is a bit of an unusual case because I think Rome-Haas, which is false statements in an affidavit, I think this court has consistently treated statements in an affidavit and held them to a higher level across the board with regard to inequitable conduct. And then there is omission of a reference. Well, this is sort of a hybrid in between, isn't it? Because it's not omission of a reference which can be cured even if the examiner finds it, even if you never intended to disclose it to him. But it's also not Rome-Haas, which is a false statement made in an affidavit, which is sort of evidence presented to the PTO. And this is attorney argument. It seems like we have a lot of cases that say things like attorney argument. As long as the reference is in front of the examiner, the attorney can argue what he wants about the reference and it's not necessarily inequitable conduct. How do you think that we ought to treat this, this hybrid? Where I see this case is one that it's an argument. The examiner has the facts. The facts are the reference. The reference is what the reference is. No amount of testimony from any individual can change what the reference discloses. That's pretty straightforward. The examiners are presumed to be able to read and understand the references. Now, you know, there is one part of the rule that says if anything contradictory is out there, you probably have to submit it. That's, in the end of the day, probably why all this was submitted. But does that mean if somebody makes some wild statement that's demonstrably false that you have to submit that? I think that cuts against the materiality here. All he did was simply make an argument. He said the only reasonable interpretation of Fossum is that the incision is at the articulation. Now, I'd like to look at that because I think that's factually true. The hairless cuticle-like skin is not only out at the edge of the umbilical crest. The patent itself shows pictures of casts where that skin is. And that skin does go back over the joint. So it extends from before the joint all the way out to over the edge of the umbilical crest. So from a factual standpoint, the hairless cuticle-like skin doesn't give any anatomical landmark to make the incision. What doesn't Fossum give the anatomical landmark is at the joint or near the articulation. And here's what's pretty interesting. In their brief at page 15, they cite the Fossum reference. They say the circumference incised the hairless cuticle-like skin. What do they do in their quote? They omit the reference to the figure. In that sentence that they cite, they've cut off the reference to the figure. The figure specifically shows an incision. And here, where did the patent examiner know? In the first office section that was issued, as referenced at 2311, the examiner had already come to the conclusion before Mr. Foster ever gave any argument that Fossum illustrates circumferential incision in the epidermis near the edge of the umbilical crest, parenthesis, C dotted line. Here the examiner concluded that the skin incision was at the dashed line in the Fossum reference long before Mr. Foster ever made his representation. And that's consistent with what the Fossum reference itself shows. So from a factual standpoint, there was no material misrepresentation at all, even assuming he was supposed to submit it and didn't, which he ultimately did. I'd like to address the legal issue too that I didn't quite get into in my first argument about whether or not if a reference anticipates or assumes a claim can't define over the prior art, whether or not that renders the claim indefinite in and of itself. I don't think any of the case law supports that at all. I think the United States Supreme Court says you have to look at the claim. You look at the claim, and if it's amenable to a construction, then you have to do a separate novelty analysis. If we believe that the law is simply that the claim, if it doesn't differentiate over the prior art, is invalid under 112, we've now done away with the need for 102, probably the Seventh Amendment to the right to a jury trial, on the factual issue of whether or not the claim is anticipated. I don't know if you have any more questions for me, I will conclude. Thank you, Mr. Hoffman. We'll take the case under advisement. Thank you.